UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| NEXPAY, INC., | |
| Plaintiff, | Case No. 3:14-cv-01749 |
| v. | Judge Trauger |
| | Magistrate Judge Newbern |
| COMDATA NETWORK, INC., | |
| Defendant. | |

## ORDER

Pending before the Court is a motion to compel filed by Plaintiff NexPay, Inc. (NexPay) (Doc. No. 99) to which Defendant Comdata Network, Inc. (Comdata) has responded (Doc. No. 106). This matter has been referred to the undersigned magistrate judge for resolution. (Doc. No. 92.) At the parties' request, the magistrate judge held a hearing on NexPay's motion to compel on August 23, 2017. The magistrate judge has also held several telephone conferences with the parties regarding related discovery issues. Based upon the parties' filings and their arguments made in court and in discovery conferences, NexPay's motion to compel (Doc. No. 99) is GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE.

**I.     Background**

The underlying facts of this matter are familiar to the parties and to the Court. For purposes of resolving this discovery issue, it is sufficient to establish that, in 2012, NexPay and Comdata held confidential discussions regarding joining forces to provide virtual payment processing services to ECHO Health, Inc. (Doc. No. 43.) NexPay claims that it developed a proprietary funding-at-authorization payment process to meet ECHO Health's specialized service demands.

1

Comdata provided credit card processing services, which ECHO Health also required. NexPay shared the funding-at-authorization model with Comdata pursuant to confidentiality agreements in negotiating the terms of their partnership. (*Id.*) NexPay now alleges that Comdata misappropriated that proprietary funding-at-authorization model to contract directly with ECHO Health. (*Id.*) Comdata denies that it misappropriated NexPay's proprietary model and counterclaims that it independently developed a funding-at-authorization process and that it was NexPay who wrongfully appropriated Comdata's proprietary information. (Doc. No. 46.)

## II. Analysis

The trial court may determine the proper scope of discovery, guided by Rule 26(b)'s direction that parties may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted 'to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (quoting *Marshall v. Westinghouse Elec. Corp.*, 576 F.2d 588, 592 (5th Cir. 1978)). Rule 37 authorizes the filing of a motion to compel a discovery response when a party provides an "evasive or incomplete" answer to an interrogatory served under Rule 33. Fed. R. Civ. P. 37(a)(3)(B), 37(a)(4).

In its motion to compel, NexPay asks the Court to order Comdata's response to six interrogatories. (Doc. No. 101.) The Court addresses these interrogatories as follows.

### A. Interrogatory 3 and Interrogatory 5

Interrogatories 3 and 5 ask Comdata to "[i]dentify all facts upon which [it] relied" in two allegations of its counterclaim against NexPay. Interrogatory 3 addresses the allegation that

"NexPay uses 'technology that mirror Comdata's Intellectual Property in many ways'." (Doc. No. 101, PageID# 1078.) Interrogatory 5 addresses the allegation that "'NexPay does not appear to have used such technology prior to its relationship with Comdata'." (*Id.*)

After the hearing on NexPay's motion to compel, Comdata moved to dismiss its counterclaim voluntarily and without prejudice. (Doc. No. 119.) NexPay opposes that motion. (Doc. No. 127.) The resolution of Comdata's motion for voluntary dismissal will materially affect NexPay's motion to compel with regard to Interrogatories 3 and 5. NexPay's motion is therefore DENIED WITHOUT PREJUDICE TO RENEWAL after disposition of Comdata's motion to voluntarily dismiss its counterclaim, which will be addressed separately.

### B. Interrogatories 7–10

NexPay's Interrogatories 7, 8, 9, and 10 seek information regarding Comdata's business and profits that NexPay states is relevant to its damages claims. (Doc. No. 101.) Specifically, the following interrogatories and responses are the subject of Comdata's motion:

> **Interrogatory No. 7**
> Identify by year the gross profits that resulted from Comdata's processing of Echo-Health-related transactions since 2012.
>
> > **Answer**
> > Comdata objects to Interrogatory No. 7 as seeking information that is not relevant or proportional to the needs of the case. Comdata further objects to this interrogatory as vague or ambiguous in its use of the phrases "gross profits," "resulted from," and "Echo-Health-related transactions." This interrogatory places no limit on the type of transaction and is overly broad in time and scope. Further this interrogatory seeks extremely sensitive and proprietary business information.
>
> **Interrogatory No. 8**
> Identify by year the gross profits that resulted from Comdata's processing of Emdeon-related[1] transactions since 2012.

---

[1] NexPay states that Emdeon is a second healthcare company for which Comdata processed payments using the funding-at-authorization process. (Doc. No. 101.)

**Answer**
Comdata objects to Interrogatory No. 8 as seeking information that is not relevant or proportional to the needs of the case. NexPay had nothing to do with Emdeon. Comdata further objects to this interrogatory as vague or ambiguous in its use of the phrases "gross profits," "resulted from," and "Emdeon-related transactions." This interrogatory places no limit on type of transaction and is overly broad in time and scope. Further this interrogatory seeks extremely sensitive and proprietary business information.

**Interrogatory No. 9**
Identify all customers or entities for which Comdata has used a funding-at-authorization funding model, including each of the following: (a) the customer or entity's name, address, and telephone number; (b) the name and contact information (e.g. phone number, email address) of the individual or individuals within the customer or entity who served as Comdata's primary contact; (c) the date on which Comdata began processing payments for the customer or entity; and (d) the date on which Comdata ceased processing payments for customer or entity (if applicable).

**Answer**
Comdata objects to Interrogatory No. 9 because it contains numerous distinct subparts and is in fact multiple interrogatories. Comdata also objects to this interrogatory as seeking information that is not relevant or proportional to the needs of the case. This interrogatory is overly broad and is not limited in time, scope, or industry and seeks the identity of customers (including individual contacts at those customers) having nothing to do with NexPay. Further this interrogatory seeks extremely sensitive and proprietary business information.

**Interrogatory No. 10**
For any customer or entity identified in response to Interrogatory No. 9, please identify the gross profits that resulted from Comdata's processing of transactions for such customers or entities since 2012.

**Answer**
Comdata objects to Interrogatory No. 10 as seeking information that is not relevant or proportional to the needs of the case. For example, this request would seek profit information that has nothing to do with NexPay or healthcare. Comdata further objects to this request as vague and ambiguous in its use of the phrases "gross profits" and "resulted from." Comdata further incorporates its objections to Interrogatory number 9.

NexPay brings its trade secrets misappropriation claim under the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq*. That statute provides for injunctive relief, Tenn. Code Ann. § 47-25-1703, and for damages which "can include both the actual loss caused

by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Tenn. Code Ann. § 47-25-1704(a). "In other words, the trial court may, in its discretion, award the monies actually lost by the plaintiff because of the defendant's misappropriation; however, if the amount of the defendant's unjust enrichment is greater than the amount of the plaintiff's actual loss, the damage award may be increased up to the amount of the defendant's unjust enrichment." *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *17 (Tenn. Ct. App. Jan. 28, 2010).

NexPay argues that information it requests regarding Comdata's gross profits is appropriately discovered because the relevant measures of damages for its claims are NexPay's actual damages or any profits earned by Comdata through use of the allegedly misappropriated proprietary material—here, the funding-at-authorization funding model. (Doc. No. 101) (citing *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002)). NexPay states that these interrogatories request information directly related to that calculation. Comdata objects that the requests are too broad, that the lawsuit is a "shakedown," and that Comdata's gross profits are not an appropriate measure of damages in this case. (Doc. No. 109.)

As the Sixth Circuit has recognized, applying Ohio's materially similar Uniform Trade Secrets Act, "[d]amages in trade secrets cases are difficult to calculate, because the offending company has mixed the profits and savings from increased quality and quantity of products, as well as savings from reduced research costs of research and production, with its own natural profits." *Avery Dennison Corp.*, 45 F. App'x at 485 (citing Michael A. Rosenhouse, *Proper Measure and Elements of Damages for Misappropriation of Trade Secrets*, 11 A.L.R. 4th 12 (1982)). Thus, "[w]hen the misappropriated trade secret is used to field competing products, the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains." *Id.* The

Tennessee Court of Appeals' application of the Tennessee statute's damages provision in *Hamilton-Ryker Group, LLC v. Keymon* is instructive. *Hamilton-Ryker Group, LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *1 (Tenn. Ct. App. Jan. 28, 2010). In *Hamilton-Ryker*, the court considered the appropriate calculation of damages resulting from a former employee's misappropriation of trade secret information, including information processed by proprietary software that reformatted addresses to be printed as mailing labels. *Id.* at *15. The former employee used that information to process and print mailing labels for her employer's former client, in violation of a non-compete provision in her termination agreement. *Id.* at *7.

The court of appeals affirmed the trial court's calculation of damages under the statute by applying a profit margin calculation to the "entire" amount that the employee actually billed the poached client up to the date of trial. *Id.* at *17–18. The court found that, "[r]egardless of whether [the employer] would have continued doing [the client's] work during the nearly four-year time span from [the employee's] layoff, this was a reasonable method to calculate the amount by which [the employee] was unjustly enriched for the [client's] work she obtained by virtue of the trade secret information she misappropriated from [her employer]." *Id.* at *18. The trial court distinguished this calculation from its calculation of the employer's damages arising out of its breach of contract claim, which the court limited to a percentage of the gross amount actually billed by the employee only during the term of her noncompete agreement. *Id.* at *8. Applying *Hamilton-Ryker*'s example to this case, therefore, the relevant measure of damages under the unjust enrichment provision of the Tennessee statute is a profit percentage of the gross amount Comdata obtained from clients "by virtue of" a misappropriated funding-at-authorization process. (Doc. No. 43, PageID# 331.)

Comdata first strenuously objects that it has not misappropriated any proprietary trade secret information from NexPay. It further objects that NexPay's requests are too broad for several reasons: because they are not limited to the time period covered by the parties' non-disclosure agreement; because they extend past the date of NexPay's bankruptcy; because they are not limited to profits made from customers in the healthcare field or customers with whom NexPay did business; and because they are not limited to gross profits associated with the payment-at-authorization process. Comdata also objects that the state of the art may have evolved during the relevant time period to make the claimed trade-secret innovation obsolete. (Doc. No. 109, PageID# 1282–83.) Finally, Comdata objects that the funding-at-authorization model only automated a process Comdata's employees already performed manually and that any alleged misappropriation therefore only enriched Comdata by the value of its employees' saved time. (*Id.* at PageID# 1283–84.)

The Court agrees that some limitation of NexPay's requests is appropriate, although not to the extent Comdata seeks. NexPay claims that Comdata misappropriated its funding-at-authorization process and used that model to contract independently with ECHO Health and to process virtual payments with other entities. Its discovery is therefore appropriately limited to Comdata's gross profits obtained from processing virtual payments using a funding-at-authorization model since it entered into the non-disclosure agreement with NexPay. Whether the funding-at-authorization process Comdata used in these transactions was misappropriated from NexPay or was its own independently developed model will be determined when the merits of this action are resolved, as will any questions as to whether the funding-at-authorization model became standard in the industry during the relevant timeframe.

NexPay's bankruptcy is not an appropriate limit on the scope of this discovery. First, NexPay claims that its bankruptcy was caused, at least in part, by Comdata's misappropriation of its funding-at-authorization model. Second, the Tennessee Trade Secrets Act allows the court to take into account both a plaintiff's actual loss and "unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Tenn. Code Ann. § 47-25-1704(a). If Comdata continued to profit from use of the allegedly misappropriated funding process after NexPay's bankruptcy, a court may consider that fact in making an award under the statute. *See Hamilton-Ryker Group*, 2010 WL 323057, at *18 (finding that, regardless of whether plaintiff would have continued to do business with its former clients, calculating damages based upon defendant's gross profits extending to the date of trial "was a reasonable method to calculate the amount by which [defendant] was unjustly enriched"). The proper measure of unjust enrichment here is the "work [Comdata] obtained by virtue of the trade secret information [it] misappropriated." *Id.*

That may include profits Comdata made through work done using misappropriated trade secret information with other clients. However, because NexPay limits its claims to profits earned by "using NexPay's Evaluation Material, trade secret, confidential and proprietary information to process virtual payments in the healthcare industry" (Doc. No. 43, PageID# 333, ¶ 39), NexPay's discovery is properly limited to profits made from clients in that field. Finally, Comdata's argument that the information NexPay seeks is "extremely sensitive and proprietary business information" is fully addressed by the protective order that is in place in this litigation. (Doc. No. 34.)

### III. Conclusion

Accordingly, NexPay's motion to compel is GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE. Comdata shall produce the following information pursuant to the applicable provisions of the parties' protective order on or before October 20, 2017:

**Interrogatory 7:** Identify by year the gross profits that resulted from Comdata's processing of transactions for ECHO Health using a funding-at-authorization funding model since 2012.

**Interrogatory 8:** Identify by year the gross profits that resulted from Comdata's processing of transactions for Emdeon using a funding-at-authorization funding model since 2012.

**Interrogatory 9:** Identify all other customers or entities for whom Comdata has used a funding-at-authorization funding model to process virtual payments in the healthcare industry since 2012, including (a) the customer or entity's name, address, and telephone number; (b) Comdata's primary contact for the customer or entity with contact information (i.e., email address and/or telephone number); (c) the date on which Comdata began processing payments for the customer or entity; and (d) the date on which Comdata ceased processing payments for the customer or entity, if applicable.

**Interrogatory 10:** For any customer or entity identified in response to Interrogatory No. 9, identify the gross profits that resulted from Comdata's processing of transactions using a funding-at-authorization funding model for such customers or entities since 2012.

The motion to compel responses to Interrogatories 3 and 5 is DENIED WITHOUT PREJUDICE to refiling after resolution of Comdata's motion to dismiss its counterclaims voluntarily and without prejudice.

It is so ORDERED.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge