**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **NEXPAY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-01749** |
| | ) | **Judge Aleta A. Trauger** |
| **COMDATA NETWORK, INC., d/b/a** | ) | |
| **COMDATA CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 176) filed by defendant Comdata Corp. ("Comdata"), incorrectly named in this lawsuit as Comdata Network, Inc. The motion has been fully briefed by both parties, as set forth below. Because the court finds that there are genuine disputes as to material facts, the Motion for Summary Judgment will be denied.

## I.    PROCEDURAL BACKGROUND

Plaintiff NexPay, Inc. ("NexPay") initiated this action against Comdata in Texas state court in July 2014, asserting claims for misappropriation of trade secrets and breach of contract. Comdata promptly removed the case to federal court and then effected the transfer of the case to this district. NexPay filed its "Second Amended Original Petition" (Doc. No. 43) (*i.e.*, its second amended complaint, referred to hereafter as "Complaint") in May 2015. Shortly after Comdata filed its Answer and Counterclaim (Doc. No. 46), the action was stayed as a result of the Suggestion of Bankruptcy filed by NexPay. (Doc. Nos. 52, 53.)

In July 2016, the court granted NexPay's Motion to Lift Stay Imposed July 6, 2015. (Doc. No. 56.) The parties thereafter embarked upon a contentious course of discovery, and

Comdata, in light of NexPay's financial status, sought and was granted leave to voluntarily dismiss without prejudice its Counterclaim. NexPay is no longer a going concern, and this action is pursued by specially appointed counsel at the request of NexPay's bankruptcy trustee. (Doc. No. 55-1.)

Comdata's Motion for Summary Judgment (Doc. No. 176) and supporting documents— including both a redacted and a sealed Memorandum of Law (Doc. Nos. 177, 184), a redacted and a sealed Statement of Undisputed Material Facts (Doc. Nos. 178, 185), several declarations with exhibits (Doc. Nos. 179–82, 196), and ten sealed deposition transcripts (one consisting of two volumes) (Doc. Nos. 186–95)—were filed on June 1, 2018.

In response, NexPay filed a sealed Brief in Support of Its Opposition to Defendant's Motion for Summary Judgment (Doc. No. 207), sealed Response to Statement of Undisputed Material Facts (Doc. No. 208), as well as its own sealed declarations and a number of deposition excerpts and exhibits. (Doc. Nos. 209–12.) In addition, at the court's direction, NexPay has now filed its Statement of Additional Facts (Doc. No. 228), in accordance with Local Rule 56.01(c).

Comdata filed a sealed Response to the Statement of Additional Facts (Doc. No. 235) and a sealed Reply (Doc. No. 217). NexPay, with permission, has filed a sealed Surreply. (Doc. No. 252.)

While exhaustively briefing the dispositive motion, the parties also took the time to file various motions to exclude or strike evidence upon which the other side relies. By separate Order, the court has granted in part, but mostly denied, NexPay's Objections to and Motion to Strike Summary Judgment Evidence (Doc. No. 205), in which it seeks to strike three witness declarations, or portions thereof, filed by Comdata in support of its Motion for Summary Judgment: the Declaration of Lisa Peerman (Doc. No. 179), an in-house attorney for Comdata;

the Declaration of Stephen Matthew Thomason (Doc. No. 181), Comdata's Vice President of Business Development and formerly its Vice President of Solution Design (Thomason Indiv. Dep., Doc. No. 189, at 14); and the Declaration of Mark Perry (Doc. No. 180), a programmer analyst for Comdata (Perry Dep., Doc. No. 187, at 10). The court has also granted in small part and denied in large part Comdata's Motion to Strike the Declaration of Vincent Valentine (Doc. Nos. 218 (redacted), 223 (sealed)), and denied its Motion to Strike Plaintiff's Statement of Additional Facts (Doc. No. 235). Despite denying the motions, the court has relied little, if at all, on those portions of the evidence to which objections have been lodged, largely because that evidence is not material.

## II. FACTS

The court summarizes the relevant and material facts in the light most favorable to NexPay as the nonmovant.

### A. Introduction

NexPay characterizes itself as a "payment processing company." (Doc. No. 234 ¶ 8.) According to its Complaint, NexPay was organized in September 2011 and was engaged in the business of facilitating "electronic virtual payments and other payments in the health care industry." (Doc. No. 43 ¶ 11.)

When it was still a going concern, NexPay made "significant sums of money remitting insurance payments to medical providers through a credit card network and a payment medium known as a 'virtual credit card.'" (Def.'s Resp. to Pl.'s Statement of Add'l Facts, Doc. No. 234 ¶ 3.) NexPay characterizes Comdata as a "credit card processing company." (Doc. No. 234 ¶ 8.) It explains that companies like Comdata and NexPay generate revenue "through what is known as 'interchange,' that is, the fees (typically a percentage of the transaction amount) that credit card

networks like Visa or MasterCard charge merchants . . . to move funds through the credit card network." (Doc. No. 234 ¶ 5.) More specifically:

> To give companies incentives to use their respective networks, these credit card networks [e.g., Visa and MasterCard] share a percentage of all interchange fees that card processors like Comdata generate through their card processing services, which are typically measured in basis points.
>
> Card processors like Comdata then share the interchange revenue with the other companies who participate in the card-payment process, such as companies like NexPay, or companies like [ECHO Health, Inc. (hereafter, "ECHO" or "Echo"), formerly NexPay's biggest client].
>
> For payment processing companies like NexPay, and for credit card processing companies like Comdata, business with ECHO can mean generating very substantial fees because ECHO *itself* assists many thousands of health insurance plans and the [third-party administrators ("TPAs")] who administer such plans, in paying millions of dollars' worth of health insurance claims each month.

(Doc. No. 234 ¶¶ 6–8 (paragraph numbers and internal citations to the record omitted).)

### B. Comdata's Business

According to Comdata's Statement of Undisputed Material Facts and NexPay's Response thereto, Comdata has been in the business of "issuing and processing electronic payment cards for decades." (Doc. No. 208 ¶ 1.[1]) It has been a commercial issuer of MasterCard accounts for nearly twenty years. (*See* Mem. Supp. M. Summ. J., Doc. No. 184, at 2.) It has been issuing "virtual" cards since approximately 2003. (Doc. No. 208 ¶ 2.) Matt Thomason defined the term "virtual credit card" as follows:

> It's a one-time use, 16-digit MasterCard in our case, whereby you have the ability to set rules such as the exact amount authorization. So a $100 card can only be authorized for $100, and different security measures like that. And then once it's done you don't use that number again. Generally, they're used for a specific

---

[1] This statement, set forth in Comdata's Statement of Undisputed Material Facts, is supported only by a reference to Comdata's now dismissed Counterclaim which, in any event, was not sworn to and does not constitute evidence. NexPay purports to dispute the "fact" on this basis, but also concedes that it has no material effect on NexPay's claims or defenses. (Doc. No. 208 ¶ 1.) The court includes it for purposes of background and context only.

invoice or payment, kind of like a check number.

(Doc. No. 189, at 19–20.) The card is in either electronic or paper format, and "all the information that would be on a regular plastic card" is delivered along with the virtual card, including an expiration date and CBC code. (*Id.* at 20.) Thomason also indicated that a "plethora of industries, almost all of them," use virtual credit cards. (*Id.* at 19.)

Being the card issuer makes Comdata responsible for the credit extended to its customers. MasterCard collects payments from Comdata for all transactions processed on MasterCards issued to Comdata, regardless of whether Comdata's customers have paid Comdata for the transactions. Accordingly, Comdata continually assesses (1) the creditworthiness of potential and existing customers, (2) the credit limit Comdata is willing to extend, and (3) the timing of customer payments. (Doc. No. 208 ¶ 27; Doc. No. 184, at 2.)

As part of its electronic payments business, Comdata uses various file types and formats to relay information to and obtain information from its customers, and then to and from payment card networks. (Doc. No. 208 ¶ 3.) It explains that the transactions at issue for purposes of this motion begin at "authorization"—when a card number and amount is entered into a point-of-sale device by the merchant (here, a healthcare provider). Authorization essentially places a hold on the card for the designated amount of money. Transactions close at "settlement"—when the merchant finalizes the transaction through the MasterCard system. Settlement triggers MasterCard to collect payment from Comdata and remit payment to the merchant. According to Comdata, the merchant controls the length of time between authorization and settlement, which can be as short or as long (within certain bounds) as the merchant desires. Comdata typically cannot predict exactly when the merchant will initiate settlement or when MasterCard will sweep funds from Comdata's account. (*See* Doc. No. 184, at 2–3.)

Comdata processes payments in "single-message and dual-message environments." (Thomason 30(b)(6) Dep., Doc. No. 190, at 18–19.)[2] Thomason explained that, in a single-message transaction, Comdata is both the card issuer and the entity that funds the transaction. ((Doc. No. 208 ¶ 9.) This type of transaction does not use the MasterCard network and is not at issue here.

Transactions that flow through the MasterCard network—including virtual cards used to pay a healthcare provider—are dual-message transactions. (*Id.* ¶ 6.) In a dual-message transaction, the first "message" is the "authorization" at the point-of-sale device. (*Id.* ¶ 7.) The second "message" is the merchant's "settlement" through the MasterCard system. (*Id.* ¶ 8.) Comdata asserts that it has historically performed three types of dual-message transactions, even before coming into contact with NexPay. It asserts that its knowledge of and ability to perform these types of transactions "demonstrate that Comdata processed payments from customers at the time a transaction is authorized well before any relationship with NexPay." (Doc. No. 184, at 5.) For instance, it has a proprietary card that is separate from the MasterCard network. (Doc. No. 208 ¶ 10.) Comdata bills a transaction on its proprietary card to accounts receivable as soon as the authorization comes through. (*Id.* ¶ 11.) Comdata also uses a "Comcheck product." When a customer uses a Comcheck, Comdata either bills the customer at the time the Comcheck is authorized or at the time the check is cashed. (*Id.* ¶ 14.) Comdata also runs some prepaid debit cards in a dual-message system. (*Id.* ¶ 14; *see generally* Doc. No. 190, at 19–21.)

### C.  The Development of NexPay's "Payment-at-Authorization" Process

As discussed below, NexPay contends that its trade secret consists of the concept of

---

[2] NexPay purports to dispute this statement, but the citation in support of its denial of the statement does not actually address the issue of single-message and dual-message. NexPay also contends the fact is not material. (Doc. No. 208 ¶ 5.)

"funding at authorization" and the process it developed for achieving or effecting funding at authorization, as used to process the payment of healthcare claims using virtual credit cards. NexPay's affiliate or predecessor, Talon Transaction Technologies, Inc. ("Talon"), developed the funding-at-authorization process at issue here in the spring of 2010 to address the business requirements of its then potential customer, Echo. (Def.'s Resp. to Pl.'s Statement of Additional Facts, Doc. No. 234 ¶¶ 14, 15, 17.)[3]

When Echo and Talon first began discussing doing business together, Echo informed Talon that it could not use Talon's services unless Talon could first show that the medical provider to whom payment was being remitted actually accepted payment in the form of a virtual credit card. (*See* Valentine Decl., Doc. No. 209 ¶ 12.) Without such confirmation, which is sometimes referred to by different witnesses as a conveyance, encumbrance, or authorization, Echo would not permit Talon to move a particular health plan's funds to satisfy a payment to a medical provider. (Doc. No. 234 ¶¶ 19–21.) To Echo, a medical provider's act of entering card information into a credit card terminal, which NexPay refers to as "authorization," signaled that the medical provider accepted that form of payment. (*Id.* ¶ 22.) However, authorization itself did not automatically move or require the movement of money to fund the payment to the provider. (*Id.* ¶ 24.)

Prior to entering into a business relationship with Echo, Talon used a "traditional" funding model for payment for virtual credit card transactions for its other clients, which it calls the "prefunding model." (Valentine Dep., Doc. No. 194, at 24; Gilman Dep. Vol. I, Doc. No. 191, at 19.) Under this model, the TPA or insurer would move the money needed to fund a

---

[3] Comdata does not dispute that NexPay created its funding-at-authorization process in 2010, but it insists, repeatedly, that NexPay's process is *a* funding-at-authorization process and not *the* funding-at-authorization process.

virtual card *before* a credit card processor would provide the card number to a company like NexPay. (Doc. No. 234 ¶ 25; Doc. No. 209 ¶ 13.) This model was unacceptable to Echo, however, because it would require Echo to move funds without a prior authorization or conveyance; that is, a provider cannot manifest acceptance of a card payment that is not remitted until after the funds are moved. (Doc. No. 234 ¶ 26.) Echo believed that moving funds without a conveyance raised regulatory concerns. (*Id.* ¶ 23.)

So Talon's staff worked to develop a solution that would satisfy Echo. What it developed became known as its "funding at authorization" process, or "post-authorization funding." (Doc. No. 234 ¶ 30; Doc. No. 209 ¶ 13.) According to NexPay, this was an "entirely new process." (Doc. No. 191, at 19–20.) Prior to entering into a relationship with Talon, Echo had never used a funding-at-authorization method for processing virtual credit card payments. (Doc. No. 234 ¶ 31.)

NexPay describes the funding-at-authorization process as follows:

Talon received a batch request of card payments from a TPA and initiated a request to the card processor for card numbers to correspond with each payment in the batch request; once Talon received the card numbers from the card processor, Talon would then remit the payment to the medical provider and then monitor the system for when the provider authorized the payment; once Talon received notice through the system (and the credit card network) that the payment had been authorized, Talon would notify ECHO of the authorization via an automated process; Talon then designed the method so that, upon receiving the notice of the authorization, ECHO would move the funds from its account to a bank account available to the card processor (Account # 1) where the funds would remain until the provider settled the transaction through the credit-card terminal.

(*Id.* ¶ 32.) Once settlement occurs, then the card processor moves the funds based on the settlement amount. (*Id.* ¶ 33.)

Another possible funding model, in addition to the pre-funding and funding-at-authorization models, is the "funding-after-settlement" model, under which the merchant

authorizes the card and then waits for the funds to move to its account before closing out on the point-of-sale device. The difference between this model and funding at authorization is that funding after settlement is a credit transaction that leaves the card processor exposed to loss if the amount authorized is never actually funded. (*See, e.g.*, Presley Dep., Doc. No. 211, at 166–68 (discussing email exchange among Comdata employees (Doc. No. 212, at 228–29), regarding the credit risks imposed by funding at settlement); Doc. No. 208 ¶ 29 ("Invoicing customers after settlement requires Comdata to float its own money with MasterCard.").) Funding at authorization is not a credit arrangement. (Doc. No. 209 ¶ 19.)

In light of the number of Echo transactions it would be processing, Talon also created an automated procedure to track all of the various categories of information it needed to complete the funding-at-authorization process. (Doc. No. 234 ¶ 34.) The automated process included the automatic creation or generation of a settlement file, which Talon calls the Echo Settlement File or ESF. The ESF contained all of the information needed to ensure that funds were moved from a TPA's account to the card processor's account upon the card's authorization. (*Id.* ¶ 35.) Talon transmitted the ESF to Echo each day to ensure that Echo moved the funds for the authorized payments. (*Id.* ¶ 36.) Talon processed payments for Echo using this model from the spring of 2010 through the early part of 2012, processing millions of dollars' worth of Echo transactions. (*Id.* ¶ 37.)

While processing virtual card payments for Echo in 2010 and 2011, Talon used a company called StoneEagle Services, Inc. ("StoneEagle") as the credit card processor, and it collaborated with StoneEagle to ensure that the funding-at-authorization process it was using for Echo worked as intended. The disclosure of information to StoneEagle regarding the process was subject to the terms of a non-disclosure agreement. (*Id.* ¶ 47.) StoneEagle did not create the

funding-at-authorization process or introduce the concept to Talon. (*Id.* ¶ 48.)

  **D.**  **NexPay and Comdata's Relationship**

  Talon and StoneEagle ended their business relationship on bitter terms in late 2011 or early 2012. In connection with the demise of that relationship, Talon conveyed its intellectual property to NexPay and closed its doors. (*Id.* ¶ 49.) NexPay, to continue doing business with Echo, needed to collaborate with another credit card processor besides StoneEagle. Beginning in late 2011 or early 2012, NexPay's representatives (all former Talon employees) began reaching out to Comdata to explore the possibility of engaging Comdata to issue credit cards for NexPay's customers, including Echo. (*Id.* ¶ 50; Doc. No. 208 ¶ 20.) Prior to disclosing any confidential or proprietary information to each other, Comdata and NexPay executed a nondisclosure agreement in January 2012 (the "Comdata NDA"). (Doc. No. 234 ¶ 51; *see* Comdata NDA, Doc. No. 212, at 68–73.)

  The Comdata NDA obligated the parties not to disclose any "Evaluation Material" shared with the other without express prior written consent and required that confidential Evaluation Material would be "used solely for the purpose of evaluating possible business relationships between [them]." (Doc. No. 212, at 68.) It defined "Evaluation Material" as follows:

> [a]ny information, data and knowledge concerning Comdata or [NexPay], regardless of form (whether in writing, oral or through visual or electronic means), which is delivered or disclosed by or on behalf of one party (the "Provider") to the other party (the "Recipient"), or which the Recipient learns or obtains orally, through observation, or through analysis of such information, data or knowledge. The term "Evaluation Material" does not include information which (a) was or becomes generally available to the public other than as a result of a disclosure by the Recipient . . . , or (b) was or becomes available to the Recipient from a source other than the Providers, or (c) was within the Recipient's possession prior to its being furnished to Recipient by or on behalf of the Provider . . . , or (d) was independently developed by the Recipient, provided it can be shown that such development was by or on its behalf without the use of, or reference to, any Evaluation Material.

(*Id.*)

After executing the agreement, NexPay exchanged with Comdata information about the volumes NexPay expected to process through Comdata's credit card system, based on the volumes Talon had processed, including transactions for Echo using the funding-at-authorization process between 2010 and 2011. (Doc. No. 234 ¶ 54.) NexPay's initial intention was to have Comdata facilitate NexPay's clients other than Echo using a prefunded model to start, but eventually to move toward having Comdata facilitate payments to Echo using NexPay's funding-at-authorization process. (Doc. No. 234 ¶ 55.)

To facilitate working with Comdata to process payments for Echo, the parties executed a second non-disclosure agreement (the "Echo NDA"), this one signed by Echo as well as Comdata and NexPay, in February 2012. (Doc. No. 212, at 74–76.) The two NDAs are materially the same. (*Compare* Doc. No. 212, at 68–70 *with id.* at 74–76.) In addition to the NDAs, NexPay implemented various policies and procedures to protect the secrecy of its trade secrets and its proprietary and confidential material. (Doc. No. 234 ¶ 59.) As a result of these practices, NexPay's Evaluation Material, trade secrets, and proprietary and confidential information are not easily accessible by the public or easily subject to duplication. (*Id.* ¶ 64.) Talon had implemented the same or similar measures when it was doing business. (*Id.* ¶ 65.)

According to NexPay, it hoped to bring Comdata on board with processing Echo payments by mid-April; to that end, it began working with Comdata on implementing its funding-at-authorization process in early February 2012. (*Id.* ¶ 67.) Over the course of meetings, telephone calls, and exchanges of documents and emails that, according to NexPay's former software developer, Vincent Valentine (Doc. No. 194, at 19), "spanned more than three months," NexPay worked to explain its funding-at-authorization process to Comdata. (Doc. No. 209 ¶ 16;

*see also* Doc. No. 212, at 4–8, 17–21, 97–111, 258–60 (exhibits documenting exchanges, meetings, and communications between NexPay and Comdata during the spring of 2012).) NexPay maintains that all of the information it conveyed to Comdata, including the information during these communications, constitutes Evaluation Material. (Doc. No. 207, at 26.)

> Regarding these communications, Valentine states:
>
> From our first conversations with Comdata personnel around February of 2012, it was clear to me that Comdata had no understanding of how to fund a payment on the post-authorization funding (or "funding at authorization") model. In the many calls and exchanges we had over the course of months, I had to demonstrate and explain, and then re-explain, the funding at authorization process multiple times until Comdata's staff obtained a foundational understanding of how the process worked generally and then what their role in that process would be. Especially during the early calls, as documented in email exchanges with Comdata personnel (such as Exhibits 4, 27, and 35), I had to explain or diagram every step and process employed to make funding at authorization work, including the categories of information that had to be tracked to ensure funds were moved and cards were sufficiently funded. Failure to ensure sufficient funding would have resulted in an insufficient funds status on ECHO's funding account, which would have led our card service to be terminated completely by the bank issuing the credit cards or by Comdata itself.

(Doc. No. 209 ¶ 17.) Until it began working with NexPay, Comdata had never used a funding-at-authorization model for funding a virtual credit card payment. (Doc. No. 234 ¶ 79.) Moreover, it did not have a funding-at-authorization process in the works at the time it began working with NexPay. (*Id.* ¶ 82.) At the time it began working with NexPay, it used a prefunded payment model with its other healthcare clients. (*Id.* ¶ 84.)

Between February and May 2012, when NexPay began processing Echo payments with Comdata "in earnest," NexPay provided Comdata all the information it needed to execute the funding-at-authorization process. (*Id.* ¶ 70.) By May of 2012, NexPay had generated revenue for itself of approximately $500,000 through funding Echo payments. (*Id.* ¶ 98.) Over the course the next year, NexPay and Comdata funded millions of dollars' worth of payments each month for

Echo. (*Id.* ¶ 71.)

As of early 2012, when it began working with NexPay, Comdata had not created a funding file equivalent to NexPay's "ESF file" "that could automatically track authorizations and provide automated instructions to TPAs on funding authorized payments." (*Id.* ¶ 81.) Comdata maintains that it was already tracking authorizations (*see* Doc. No. 185 ¶¶ 40, 44), but it does not dispute that it had not yet created what it refers to as its own funding file at that time. (Doc. No. 234 ¶ 81.)

By June 2012, Comdata employees on the Echo/NexPay "team," including Alan Ables, Alex Tune, Jelene Singh, and others, were familiar with NexPay's funding-at-authorization process. (*Id.* ¶ 106.) These individuals had disseminated that information to other NexPay employees, including Abby Craig, Matt Thomason, and Kurt Presley. (*Id.* ¶ 107.) Craig, Thomason, and Presley were assigned to develop what became known as Comdata's MT01 funding file. (*Id.* ¶ 108.)

As of May 2012, Comdata was working on developing the MT01, which it hoped to use to implement a funding-at-authorization model for Echo as well as its other healthcare clients or potential clients, including Emdeon and Key Benefits. (*See, e.g.*, Doc. No. 188, at 143–44; Doc. No. 190, at 26–27.) Comdata first began using its MT01 funding file, for either Emdeon or Key Benefits, in October 2012. (Doc. No. 190, at 28.) It also entered into a new contract with Echo around the same time. (Doc. No. 234 ¶ 110.)

Comdata insists that it began exploring the healthcare market in late 2011. It alleges that, when its legal department learned that it was contracting with healthcare customers to use Comdata's virtual card product for making healthcare claims payments, the legal department became concerned that involvement in this industry might subject Comdata to certain state and

federal regulations. (*See* Peerman Decl., Doc. No. 179 ¶ 3.) It engaged outside counsel to consider the issue and became persuaded that it could use its products in such a way as to satisfy any regulatory concerns. (*Id.* ¶¶ 4, 5.) Meanwhile, Comdata also had to consider from a credit and risk perspective how to fund claims-payments transactions for very large healthcare customers, such as Echo, in a way that would both limit Comdata's exposure to unpaid transactions and comply with applicable regulations. (Presley Dep., Doc. No. 188, at 150–51, 160; Doc. No. 189, at 94.)

Comdata maintains that, as a result of these concerns, it independently determined that the earliest point at which it could request healthcare customers to transmit funds to Comdata was after the provider had "authorized" payment. (Doc. No. 188, at 160; *see also* Doc. No. 189, at 165.) In other words, it claims that it independently came to the conclusion that a form of funding at authorization would be required for healthcare clients, and its wholly independent development of the MT01 funding file was the fruit of that conclusion. It explains that it initially developed

> a manual process that allowed Comdata to control the timing of Comdata's receipt of plan funds in a manner that would satisfy Comdata's legal and credit departments' restrictions. To gain efficiency, Comdata developed an automated process and ultimately created a file layout, referred to as the MT01, in the Comdata mainframe. At its core, the MT01 is a data file with certain transaction information used to instruct healthcare customers to pay Comdata once a provider authorizes a transaction. An application in the Comdata mainframe runs at a predetermined time each day, extracts the information reflected in the MT01, and formats that information into the file layout.

(Doc. No. 184, at 7 (citations to the record omitted).)

Based largely on the timing of Comdata's purportedly independent development of the MT01 funding file, the fact that NexPay had already disclosed to it the process it used to effect funding at authorization, and a comparison between NexPay's ESF and Comdata's MT01,

NexPay insists that the MT01 file was duplicative of, and a replacement for, the ESF that NexPay and its staff had been sending to Echo for the preceding two years. (Doc. No. 209 ¶¶ 23–24; Doc. No. 194, at 49–50.) Comdata refutes the implication that the MT01 was copied from the ESF, pointing out that NexPay never shared its ESFs with Comdata (Doc. No. 208 ¶ 83) and Comdata never saw an actual NexPay ESF or ESF layout until sometime during the course of this lawsuit. (*See, e.g.*, Doc. No. 181 ¶¶ 3, 4.) NexPay also never shared any software or code that enabled it to generate the ESFs. (Doc. No. 208 ¶ 84.) Besides insisting that its MT01 was independently developed and created, Comdata also asserts that its funding process using the MT01 file is "separate and distinct from whatever NexPay, who was not a card issuer . . . may have implemented." (Doc. No. 234 ¶ 111 Response.)

According to Vincent Valentine, however, he personally "took great amounts of time and considerable resources to explain the funding process in detail to Comdata's staff to the point of rendering the ESF file redundant to the explanation. The ESF file is just the product of the completed funding at authorization process. It's what comes out on 'the other side' when the steps in the funding process have been completed." (Doc. No. 209 ¶ 18.)

NexPay believes that Comdata was using information that NexPay had shared, in violation of the NDAs, by no later than January 2013. (Doc. No. 234 ¶ 118.) In May 2013, Echo terminated its relationship with NexPay and continued working with Comdata. (*Id.* ¶ 121; Doc. No. 208 ¶ 89.) Comdata maintains that it was solely Echo's decision to terminate the relationship with NexPay and that it made that decision, in large part, because Echo feared that NexPay's (or Talon's) dispute with StoneEagle would have adverse consequences for Echo. (*See* Davis Dep. at

27–29, 33, Doc. No. 195.[4]) NexPay insists that Comdata would not have been able to perform the service but for its improper use of NexPay's proprietary information. (Doc. No. 191, 56–57, 106–10; Gillman Dep. Vol. II, Doc. No. 192, at 67 (answering the question, "had Comdata not replicated or copied NexPay's technology, would ECHO have had anyplace [sic] else to go other than to continue doing business with NexPay?" with "No. They would not have anyplace [sic] else to go. We were the sole source.").)

Echo was NexPay's biggest customer. After losing Echo as a client, NexPay filed for bankruptcy protection in June 2015. NexPay maintains that it would not have been forced to seek bankruptcy protection but for the loss of Echo as a client, which it blames on Comdata's appropriation of its funding-at-authorization process. (Doc. No. 192, at 67 (in which Gillman testified that the last monthly check NexPay received from Echo was for over a million dollars and that, if that revenue had continued, there was "no question" that NexPay would not have been forced to file for bankruptcy).)

Meanwhile, Comdata has expanded its services to other clients. It provides virtual card payment services for its client Emdeon, a client it was only able to land in mid-2012 because of its ability to offer a "new funding model"—funding at authorization. (Doc. No. 234 ¶ 131.) While Comdata disputes using or misusing NexPay's funding-at-authorization process, it does not dispute that it has profited from using its MT01 funding file layout by working for Emdeon. (Doc. No. 234 ¶ 142.) Comdata maintains that it does not process payments in the exact same manner as NexPay did and that it developed its own funding-at-authorization process that allowed it to control the timing of Comdata's receipt of plan funds in a way that would satisfy Comdata's legal and credit departments' restrictions on processing payments for healthcare

---

[4] The pagination for this deposition is consistent with the pagination reflected on the actual transcript rather than with the CM/ECF pagination.

clients.

## III.     STANDARD OF REVIEW

Rule 56 requires the court to grant a motion for summary judgment, if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim, the moving defendant must show that, as a matter of undisputed material fact, the plaintiff cannot establish at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## IV.     ANALYSIS

### A.       Misappropriation of Trade Secrets

NexPay brings suit under the Tennessee Uniform Trade Secrets Act ("TSA"), Tenn. Code

Ann. § 47-27-1701 *et seq.*, which "creates a cause of action for misappropriation of another's trade secrets." *Ram Tool & Supply Co., Inc. v. HD Supply Const. Supply, Ltd.*, No. M2013-02264-COA-R3CV, 2014 WL 4102418, at *11 (Tenn. Ct. App. Aug. 19, 2014), *appeal granted on other grounds, cause remanded* (Nov. 24, 2015). Under the TSA, the elements of a claim for a misappropriation of trade secrets are: "(1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (Sharp, J.) (citation omitted).

In drafting the TSA, "[t]he Tennessee legislature adopted the definition of 'trade secrets' under the Uniform Trade Secrets Act, and also adopted additions which make Tennessee's definition even broader than the definition in the Uniform Act." *Hamilton-Ryker Group, LLC v. Keymon*, No. W2008-00936-COA-R3-CV, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan. 28, 2010). The TSA defines "trade secret" to mean

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. 47-25-1702(4). "Several factors are relevant to determining whether information falls within this statutory definition, including the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007). It is a fundamental aspect of a trade secret that it actually must

be secret. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. Information that is public knowledge or that is generally known in an industry cannot be a trade secret." (internal citations omitted)).

Comdata seeks summary judgment in its favor on the grounds that (1) NexPay has never adequately identified the information it claims to constitute trade secrets; (2) NexPay's idea of funding at authorization is not protectable as a trade secret, because (a) the idea is not secret, as it came from, and was disseminated by, a non-party and is used by others in the healthcare industry and other industries; (b) the "bare idea" that a company invoice a customer at a particular time during a commercial transaction is readily ascertainable by others in the industry; and (c) NexPay offers no proof that its purported trade secret had independent economic value; and (3) NexPay cannot establish that Comdata misappropriated any trade secrets, because (a) insofar as the trade secret consists of the Echo Settlement File ("ESF"), the ESF file layout, or NexPay's software, this information was never conveyed to or shared with Comdata; and (b) Comdata never used the funding diagram upon which NexPay relies to create its own software and system.

The court finds, as set forth herein, that NexPay has established the existence of material factual disputes as to each of these issues and as to each element of its misappropriation claim, thereby defeating summary judgment in favor of Comdata.

### 1. NexPay Has Adequately Identified Its Trade Secret

Generally, "'[a] party alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity.'" *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *6 (Tenn. Ct. App. Aug. 25, 2015)

(quoting *Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2012 WL 2524008, at *9 (W.D. Mich. June 29, 2012). Comdata asserts that NexPay has never identified its alleged trade secrets with particularity, that the description in the Complaint is untenably vague, and that the witness testimony on the topic has shifted.

In response, NexPay refers to the court's identification of its trade secrets as set forth in an October 2017 order granting a discovery motion:

> a proprietary funding-at-authorization payment process [developed] to meet ECHO Health's specialized service demands[, for which] Comdata provided credit card processing services, which ECHO Health also required. NexPay shared the funding-at-authorization model with Comdata pursuant to confidentiality agreements in negotiating the terms of their partnership.

(Doc. No. 207, at 20 (citing Doc. No. 137, at 1–2).) More concisely, NexPay identifies the trade secret as its "funding-at-authorization" process, including "the ordered steps for moving funds based on authorization to satisfy a claim for virtual payment." (*Id.* at 21.) NexPay maintains that its Complaint was adequate to put Comdata on notice of what it is accused of misappropriating. In relevant part, the Complaint alleges that NexPay taught "Comdata how to satisfy ECHO's specific and specialized concerns by sharing NexPay's 'payment optimization' process and funding processes with Comdata so that Comdata could provide the account services NexPay needed to complete payments for ECHO" and that these steps were the subject of the January NDA. (Doc. No. 43 ¶¶ 25–26.)

The court finds that NexPay has adequately identified what it considers to be its trade secrets and that the allegations in the Complaint were sufficient to put Comdata on notice of what it is accused of misappropriating: NexPay's idea of funding at authorization and the process it developed for effecting funding at authorization.

### *2. Whether NexPay's Alleged Trade Secret Is Protectable As Such*

#### *a. Was the Trade Secret a Secret?*

For information to be protectable as a trade secret, it must actually be secret. *Ruckelshaus*, 467 U.S. at 1002. Comdata argues that NexPay's alleged trade secret is not protectable because the idea of funding at authorization was not NexPay's idea and was never secret, as it came from, and was disseminated by, a non-party and is used by others in the healthcare industry and other industries. (Doc. No. 184, at 20.)

In support of this thesis, it contends that NexPay "concedes that Echo required NexPay to process Echo's healthcare transactions upon authorization." (Doc. No. 184, at 20–21.) Comdata cites to substantial evidence in the record that, at a minimum, creates some confusion regarding the provenance of the idea and the process of funding at authorization. It claims both that StoneEagle and/or Echo introduced the idea to Talon and, therefore, that it does not qualify as a secret. (*See* Doc. No. 184, at 21.) It also points to testimony by Bill Davis of Echo, who claimed that the "industry" knew about the process and that other industries operated similarly. (*Id.* at 22 (citing Davis Dep. at 21, 23, Doc. No. 195).) Davis further testified that he had discussed Echo's requirements with other vendors, including at least Total Systems and FDR, and that he believed that any of them could have functioned as a program manager to effect funding at authorization for its healthcare claims transactions. (Doc. No. 195, at 40–41.) Echo did not actually engage any of these other companies, however.

Comdata also argues that, even prior to coming into contact with NexPay, it moved funds upon authorization in other business lines, outside the context of healthcare claims payments, and that other industries outside of healthcare "operate similarly." (Doc. No. 184, at 21.) Specifically, it points to Matt Thomason's deposition testimony regarding other types of

transactions Comdata had historically engaged in prior to its contact with NexPay, including Comchecks and other payment models (*see* Doc. No. 190, at 19–20), and Bill Davis's testimony that he believed the rental car and hotel industries used a similar process (*see* Doc. No. 195, at 22).

In sum, Comdata contends that this evidence, together, establishes that the "idea" of funding at authorization did not originate with NexPay, that it was never a secret, and that, as a result, others were under no obligation to maintain its confidentiality. (Doc. No. 184, at 22 (citing *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 891 (E.D. Ky. 2003) ("[O]nce a trade secret is disclosed to 'others who are under no obligation to protect the confidentiality of the information, or [is] otherwise publicly disclosed . . . , [the] proprietary right is extinguished.'" (quoting *Ruckelshaus*, 467 U.S. at 1002)).) It also argues that the process itself was likewise never a secret, as it was shared with and used by others, or others independently created their own process for achieving the same effect.

In response, NexPay argues that there is at least a genuine factual dispute as to the question of secrecy and that the testimony upon which Comdata relies is subject to differing interpretations. NexPay relies principally upon the Declaration of Vincent Valentine. In this Declaration, Valentine testifies that he was the "primary architect" of the funding-at-authorization model, while he was still working for Talon, and he discusses the efforts both Talon and later NexPay made to maintain the confidentiality of the model. (Doc. No. 209 ¶¶ 6–9.) He specifically refutes Comdata's interpretation of an email from Robert Allen, with StoneEagle, as establishing that StoneEagle introduced the concept and process of funding at authorization to NexPay/Talon. Valentine states: "Similar to Comdata . . . , Robert Allen supplied a document rehashing previous discussions to show his understanding of the funding at

authorization process that Talon had previously discussed with StoneEagle. (Doc. No. 209 ¶ 10.) He states that StoneEagle's part in the process was similar to the part Comdata played with NexPay: "both companies maintained and provided Talon (or NexPay) with access to a credit card switch (a 'switch' is an authorization platform used to authenticate card transactions; the switch is what provides access to the card account's authorization and balance information)." (Doc. No. 209 ¶ 10.) He also states that Talon's "development meetings" with StoneEagle, like those between NexPay and Comdata, were subject to a nondisclosure agreement. (Doc. No. 209 ¶ 10.)

Valentine also disputes Comdata's assertion that Echo provided Talon with the funding-at-authorization model or even the idea. According to Valentine, Echo did not tell Talon to "fund at authorization"—it simply told Talon in 2010 that it could not use Talon's services "unless the medical provider who was receiving the payment first indicated that he or she accepted the virtual card. Only upon acceptance of the card would funds be transferred from Echo to [the] card funding account." (Doc. No. 209 ¶ 12.) The process that Talon's card processors at the time were using could not account for Echo's requirements,

> because the existing model required the client to move the funds for a particular card before we even sent the card to the medical provider for payment. So Talon worked to provide a solution for ECHO, which became known as post-authorization funding (or "funding at authorization"), and provided that service to ECHO between 2010 and 2011 (and into 2012). ECHO did not give us that process or tell us how to solve the problem. So when I testified in my deposition that ECHO required us to load the card and then track whether or not the card was authorized, I was not admitting (as Comdata says in its summary judgment) that funding at authorization itself was something ECHO required. My statement was just a short-hand reference to ECHO's business requirements that required us to create and then use the funding at authorization process.

(Doc. No. 209 ¶ 13.)

Valentine also addresses Comdata's contention that the concept of funding at

authorization and the process for achieving it were "prevalent in other lines of business" before Comdata came in contact with NexPay or that Comdata's other methods of processing payments, as outlined by Matt Thomason in his deposition (including the use of "Comchecks," prefunded cards, self-funded cards, or the payment-at-settlement model), are equivalent, or even similar, to funding at authorization. According to Valentine, the payment-at-settlement model requires billing a transaction to accounts receivable. It is, unlike funding at authorization, a credit arrangement. (Doc. No. 209 ¶ 19.) Funding at authorization "triggers a transfer of funds *prior to the settlement*, and it is the settlement that is the financial transaction on the credit card network." (Doc. No. 209 ¶ 19.) Likewise, according to Valentine, Comdata's "Comchecks" product is "another credit line example that would be invoiced at a later date. Nothing in what Mr. Thomason describes indicates that in the Comchecks example, Comdata will actually have the client funds on hand *when the transaction settles*, which is what would be required to qualify as 'funding at authorization.'" (Doc. No. 209 ¶ 20.) And finally, Thomason's attempt to equate funding at authorization with the use of a prepaid debit card is unavailing because, again according to Valentine, funds for a prepaid debit card must be on hand when the card is issued. (Doc. No. 209 ¶ 21.) A prepaid debit card does not allow for funding at authorization; it provides for funding prior to authorization. In the post-authorization model, however, "funds are not on hand until a card is authorized and therefore cannot be 'prepaid.'" (Doc. No. 209 ¶ 21.)

NexPay also refutes the suggestion that others in the healthcare industry use its model and procedure—unless that procedure has been shared with them by Comdata. There is no evidence in the record that hotels and rental car companies, for example, use funding at authorization or, even if they do, that their process is similar to NexPay's process for funding at authorization. And Davis's assertion that others in the healthcare industry were already familiar

with the process amounts to speculation on his part. Davis, in fact, was unclear about what, exactly, the process entailed. Although he believed that "the industry knew" about Echo's business requirements for funding a virtual credit card and he believed that the process "pre-exist[ed] Echo," when asked to describe the process he was talking about, he was vague: "You'd have to ask the rental car people and the hotel people how they do it. I think it may be a preauthorization. I . . . don't really know." (Doc. No. 195, at 24.) At the same time, he also acknowledged that one of the reasons Echo never had a written contract with NexPay initially was because this was an entirely "new process" and they were not sure how it would work. (Id. at 26–27.)

Based on the totality of the evidence in the court's record, the court finds that there is a genuine, material factual dispute as to whether the idea of, and procedure for, funding at authorization were sufficiently secret to warrant trade secret protection.

### b. Whether the Idea and Process Were "Readily Ascertainable"

Next, Comdata argues that the "bare idea" "that a company invoice a customer at a particular time during a commercial transaction" and the manner by which funds flow in processing such a customer payment are not protectable as a trade secret, because they are "readily ascertainable by a sophisticated card-processing company" and, as such, are "capable of being acquired by competitors or the general public without undue difficulty or hardship." (Doc. No. 184, at 23 (quoting *Arco Indus. Corp. v. Chemcast Corp.*, 633 F.2d 435, 441 (6th Cir. 1980)).) It asserts very broadly that, by the time it entered into a business relationship with NexPay, it was "already capable of requesting customer payments at various times before, during, and after a transaction." (Doc. No. 184, at 23.)

In response, NexPay argues that its trade secret concerns the idea of funding at

authorization, but it also encompasses the precise steps—the entire process—for achieving funding at authorization. It maintains that, although the concept of authorization, *per se*, was widely known, the idea of funding at authorization was not, and the way in which all of the components of NexPay's process work together in the virtual-card-payment context makes the entire funding-at-authorization process as developed by NexPay protectable. (Doc. No. 207, at 22 (citing *Harsco Corp. v. Piontek*, No. 3:07-cv-0633, 2008 WL 686217, at *8 (M.D. Tenn. Mar. 5, 2008) (Trauger, J.) ("Even though certain components [of the plaintiff's process] are commercially available . . . or otherwise publicly known, the way in which all of the components are assembled and utilized in the . . . process makes the entire . . . operation protectable." (citation omitted))).)

As a general matter, trade secret law does not protect "an idea which is well known or easily ascertainable." *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 385 (6th Cir. 2014) (applying Michigan law) (quoting *Manos v. Melton*, 100 N.W.2d 235, 238 (1960)). Likewise, "[t]rivial advances or differences in formulas or process operation are not protectable as trade secrets." *Id.* (quoting *Manos*, 100 N.W.2d at 239 (internal quotation marks omitted)); *see also Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F.Supp.2d 1001, 1017 (E.D. Cal. 2011) ("Proprietary ways of doing the same thing that others in the same field do are not trade secrets.").

NexPay, however, points out that, despite Comdata's claim that the process or idea was readily ascertainable, Comdata was not using a funding-at-authorization method of processing virtual credit card payments prior to coming into contact with NexPay, and it has not identified anyone else in the industry who was actually using the process at that time either. In addition, Vincent Valentine refutes the suggestion that the idea or process was readily ascertainable,

attesting in his Declaration that it took "weekly phone calls, emails, and side conversations" between Comdata and NexPay over the course of three months in order to bring Comdata on board with the process and its role in facilitating it. (Valentine Decl., Doc. No. 209 ¶ 16.) These communications and the information shared in the course of them were, according to NexPay, protected by the NDAs. And Valentine attests, based on those numerous conversations with Comdata personnel, that it was clear to him that Comdata had no prior understanding of the model, had never used funding at authorization in previous transactions with any other client, and did not reach an understanding of the process until after Valentine had "explain[ed] or diagram[ed] every step and process employed to make funding at authorization work, including the categories of information that had to be tracked to ensure funds were moved and cards were sufficiently funded." (*Id.* ¶ 17.) The record includes a number of emails and other documents substantiating Valentine's testimony. (*See, e.g.*, Doc. No. 212, at 4–8, 17–21, 97–111, 258–60.)

David Gillman testified in his deposition that, at the time Echo and Comdata ceased doing business with NexPay in May 2013, to his knowledge, no other company had the capability of performing the funding-upon-authorization process that NexPay had developed for Echo. (Doc. No. 192, at 66–67.) He testified that, if Comdata had not "replicated or copied NexPay's technology," Echo would not have been able to continue using the funding-at-authorization process without involving NexPay. (*Id.* at 288, Doc. No. 192, at 67.)

The court finds that this evidence, together with other evidence in the record, is sufficient to create a material factual dispute as to whether the concept of funding at authorization and the model NexPay developed for implementing this concept, together, consist of more than simply a broad, unprotectable "idea." In addition, material factual disputes preclude summary judgment on the question of whether the concept and the steps to implement the process were actually

readily ascertainable, as Comdata claims.

### c. Whether the Trade Secret Has Independent Economic Value

The Sixth Circuit has held that it is "critical[ly] importan[t]" that the secret information the plaintiff seeks to protect "must afford the owner a competitive advantage by having value to the owner and potential competitors." *Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 922 (6th Cir. 2008) (citing *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410–11 (6th Cir. 2006) (applying Michigan law)); *see also Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1017 (W.D. Tenn. 2015) (holding under the TSA that, to be protected as a trade secret, "the information must derive independent economic value from not being generally known"); *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (defining a protectable trade secret, in part, as a process that "affords a competitive advantage" by virtue of its secrecy). To determine whether information derives independent economic value from not being generally known or readily ascertainable, courts typically look to:

> (1) the value of the information to the plaintiff and to its competitors;
>
> (2) the amount of effort or money the plaintiff expended in developing the information;
>
> (3) the extent of measures the plaintiff took to guard the secrecy of the information;
>
> (4) the ease or difficulty with which others could properly acquire or duplicate the information; and
>
> (5) the degree to which third parties have placed the information in the public domain or rendered the information "readily ascertainable."

140 Am. Jur. 3d *Proof of Facts* 291 § 6 (2014) (citations omitted).

Comdata argues that it is entitled to summary judgment because NexPay has offered no

proof that its trade secret has independent economic value. It argues that NexPay has "made no effort to market its 'funding at authorization' process to attract other customers," never "solicit[ed] offers for the purported intellectual property," "made no effort to license or sell the purported trade secret(s) to another service provider," and, even in bankruptcy, the "Trustee has made no effort to monetize the purported trade secret(s)." (Doc. No. 184, at 23–24.)

All of those statements appear to be true. As set forth above, however, the law countenances other means of establishing economic value. The court has already determined that whether NexPay's funding-at-authorization process is easy to duplicate or acquire—that is, whether it is readily ascertainable—is the subject of a material factual dispute. Comdata does not attempt to refute NexPay's testimony that it spent substantial effort and resources on developing the process and maintaining its secrecy. According to NexPay, only Comdata—not "third parties"—has conveyed the trade secret information to others or placed it in the public domain, and Comdata has continued to derive economic value from NexPay's trade secrets by continuing to use that information in working with Echo and other healthcare clients.

Although there is substantial evidence in the record to support Comdata's position, NexPay has nonetheless established the existence of a material factual dispute as to this question too.

### 3. Misappropriation

The TSA defines "misappropriation" as follows:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2). In this case, NexPay alleges that Comdata disclosed or used its trade secret without consent and with knowledge that it had acquired the trade secret under circumstances giving rise to a duty to maintain its secrecy or limit its use. (*See* Doc. No. 207, at 24.)

Comdata argues that NexPay cannot establish misappropriation by Comdata insofar as the trade secret consists of the Echo Settlement File, the ESF file layout, or NexPay's software, because NexPay never shared that information with Comdata. It also argues that its employees independently created Comdata's own funding-at-authorization process, without reference to the funding diagram or any other information NexPay conveyed to Comdata.

For its part, NexPay does not dispute that it never provided the actual ESF, ESF file layout, or software to Comdata. It contends, however, that there is ample evidence in the record from which a jury could conclude that Comdata misappropriated its trade secret:

Start with the fact that before meeting NexPay, Comdata had never processed a payment at authorization and had no real knowledge of how to do it. Then, beginning in April and May of 2012, Comdata made a now-obvious and purposeful effort to access and learn NexPay's proprietary processes, including what kinds of information NexPay was providing to ECHO to make the funding-at-authorization process work. . . . Indeed, by June of 2012, NexPay had given

Comdata's employees everything they needed to know to make the funding at authorization work, which is what they did despite no less than two NDAs. These individuals disseminated what they learned from NexPay to other team members, including Abby Craig, Matthew Thomason, and Kurt Presley, who were then assigned to develop what would become Comdata's own competing MT01 process. Even still, it took Comdata several more months of "playing computer" before Comdata succeeded in creating the MT01 file that resulted in NexPay's ouster from the relationship.

Then, to make matters worse for NexPay, Comdata used NexPay's process without its permission, and shared it with another NexPay competitor, Emdeon, touting the funding-at-authorization model as a "new funding model.". . . The individuals within Comdata who assisted in bringing Emdeon up to speed on the funding-at-authorization process are primarily the ones who NexPay had brought up to speed, e.g., Ables, Tune, Singh, Craig, Presley, among others.

(Doc. No. 207, at 24–25 (internal citations to the record omitted).)

Based on the circumstantial evidence placed in the record by NexPay, the court finds that a material factual dispute as to whether Comdata misappropriated NexPay's trade secret precludes summary judgment on this issue and, consequently, on the issue of trade secret misappropriation as a whole.

## B.      Breach of Contract[5]

"'The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract.'" *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006) (quoting *ARC LifeMed, Inc. v. AMC–Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). "To prevail on any breach of contract claim, the plaintiff must prove all elements." *Hampton v. Macon Cty. Bd. of Educ.*, No. M2013-00864-COA-R3-CV, 2014 WL

---

[5] Although the TSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret," it does not preempt claims based on "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret." Tenn. Code Ann. § 47-25-1708(a)–(b). Thus, NexPay's breach of contract claim is not preempted by the TSA. *Accord Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *3 n.1 (Tenn. Ct. App. Aug. 25, 2015).

107971, at *9 (Tenn. Ct. App. Jan. 10, 2014).

There are two essentially identical non-disclosure contracts at issue here, both of which provide that the parties shall exchange "Evaluation Material" for the purpose of evaluating a business relationship between them and require the parties to maintain the confidentiality of such Evaluation Material. The term "Evaluation Material" is broadly defined as virtually any information or knowledge concerning either party conveyed to or learned by the other party, though the definition excludes information that "was or becomes" generally available to the public—other than as a result of disclosure by the recipient—and information already in the possession of, or independently developed by, the recipient of such knowledge. (Doc. No. 212, at 68.)

Comdata argues that NexPay has not sufficiently identified what "Evaluation Material" it believes Comdata has misused and that NexPay cannot establish misuse of confidential information for the same reasons it cannot prove misappropriation of trade secrets, that is, that the information Comdata is alleged to have wrongfully disclosed was not proprietary to NexPay or was not confidential. NexPay argues that there is at least a material factual dispute as to whether Comdata breached the NDAs by using and disclosing to others, including Emdeon, "a whole host of Evaluation Material (e.g. confidential ways in which NexPay does business, solutions to problems that arise in settling card payments, payment-at-authorization itself), in ways that violated the NDA." (Doc. No. 207, at 26 (citations to the record omitted).) It further maintains that Comdata's use and disclosure of Evaluation Material caused NexPay damages.

The proof required to establish breach of contract in this case is very similar to, though not precisely co-extensive with, that required to prove misappropriation of trade secrets. *See Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001) (construing a

confidentiality agreement as reflecting the parties' intent to be bound by common law trade secret principles); *id.* at 589 (distinguishing between the protection afforded trade secret information and that afforded information protected by a confidentiality agreement, noting in particular that "information which was acquired by the defendant through the confidential relationship may be protected even if the information potentially could have been obtained through independent research," unlike a trade secret, which by definition cannot easily be "acquired by proper means").

Regardless, Comdata effectively concedes that proof of trade secret misappropriation will also supply proof of breach of the NDAs. (*See, e.g.*, Doc. No. 184, at 26 ("Just as none of the information NexPay actually provided to Comdata is a trade secret, none of that same information is 'Evaluation Material.' NexPay's claim thus fails as a matter of law."); Doc. No. 217, at 17 ("NexPay appears to confirm that its breach-of-contract claim is based on the same set of 'facts' upon which NexPay claims misappropriation.").) Because material factual disputes preclude summary judgment on the trade secret misappropriation claim, material factual disputes likewise bar summary judgment on the breach of contract claim.

## V. CONCLUSION

For the reasons set forth herein, Comdata's Motion for Summary Judgment (Doc. No. 176) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge